# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No.  3:19-CR-00014 (NKM)** |
| | : | |
| **v.** | : | |
| | : | |
| **DANIEL MCMAHON** | : | |
| | : | |
| | : | |

_____

## SENTENCING MEMORANDUM OF THE UNITED STATES

The defendant, Daniel McMahon, from his home in Florida, waged an online campaign of racially-motivated intimidation and threats of force and violence against Don Gathers, a local African American activist in the Charlottesville community who sought to better that community by running for local office.   His campaign worked.   After learning of the threats, Gathers dropped out of the race.   The defendant – having successfully wielded intimidation and violent threats – declared victory.

On August 28, 2019, the defendant was indicted by a grand jury in the Western District of Virginia and arrested in Florida soon thereafter.   Upon the arrest of the defendant and the FBI's search of his electronic devices, the government learned the defendant's campaign against Gathers's candidacy was merely the tip of the iceberg.   After the defendant intimidated Gathers, he harassed, intimidated, and caused substantial emotional distress to Victim 2 through an onslaught of vile, abhorrent communications through Facebook, including threats to sexually assault her minor, autistic daughter.   The defendant harassed and intimidated Victim 2 in a twisted effort to extort a complete stranger for information that he could then use to intimidate and harass still more people.

For all of this conduct, Daniel McMahon now stands before the Court having pleaded guilty to Bias-Motivated Interference in an Election and Cyberstalking.   The government submits this

1

memorandum in support of the only sentence that is appropriate under the § 3553(a) factors: a term of 41 months' imprisonment, followed by a term of three years of supervised release. Just as important as the term of incarceration, the defendant's supervision period must include a condition that prohibits his use of the internet without prior approval from the Probation Office. Only a sentence that satisfies these three components—imprisonment, a maximum term of supervised release, and a condition that prohibits the defendant from returning to the internet to commit similar crimes—will appropriately serve the interests of justice here.

## I.     SUMMARY OF THE FACTS

### A.     Count One – Bias-Motivated Intimidation and Interference with Don Gathers, Candidate for Charlottesville City Council

#### 1.     Background and the Identification of "Jack Corbin"

In late 2017, the FBI in Charlottesville was investigating a California-based white supremacist group called the Rise Above Movement, whose members had traveled to Charlottesville to commit acts of violence in furtherance of the "Unite-the-Right" riots that occurred on August 11-12, 2017. As part of that investigation, the FBI discovered a YouTube video that depicted members of the Rise Above Movement committing acts of violence against counter-protestors on August 12, 2017. The video was entitled "Proof Antifa Started the Violence in Charlottesville" and was posted by the account named "Jack Corbin." In March 2018, the Federal Bureau of Investigation identified "Jack Corbin" as the defendant, Daniel McMahon (hereinafter, "the defendant" or "McMahon").

On March 26, 2018, agents of the Federal Bureau of Investigation interviewed McMahon, who lived in Brandon, Florida, a suburb of Tampa. In this interview, the defendant admitted that he was "Jack Corbin" and that he had posted the aforementioned video as part of the online "research" he had been conducting in an effort to find out the "truth" about what happened at the Unite-the-Right rally on August 12, 2017.

### 2. Don Gathers's Candidacy for Charlottesville City Council and the Defendant's Campaign to Stop It

Don Gathers is a 61-year-old African-American resident of Charlottesville who, for a number of years, has been engaged on civic issues affecting, among others, the African-American community in Charlottesville.   On January 7, 2019, the Daily Progress – a local newspaper in Charlottesville– published an article *"Gathers . . . Running for City Council."*   The article stated that Don Gathers was planning to announce his candidacy for Charlottesville City Council at an event to take place on January 8, 2019.

By January 2019, the defendant had obtained numerous social-media accounts on various platforms, including (but not limited to) Gab.ai, Facebook, and Twitter.  Gab.ai is a publicly available social media platform that allows users to create a profile, post public messages (including images), and follow/unfollow others.   On his social media accounts, McMahon's most frequently used pseudonym/online persona remained "Jack Corbin," but he also used the names "Pale Horse," "Restore Silent Sam," "Dakota Stone," and various others.   On these accounts, the defendant expressed and promoted his white-supremacist and white-nationalist views.  He also expressed support for social and racial policies of Nazi-era Germany, and for bias-motivated mass murderers such as Dylan Roof [1] and Robert Bowers. [2]   The defendant had thousands of "followers" on social media.

Within hours of the January 7, 2019 publication of the Daily Progress article about Gathers's expected bid for Charlottesville City Council, the defendant – from his Florida residence and under his screen name "@JackCorbin" on his Gab.ai account – posted the following:

*Don Gathers, the nigger terrorist attacking Mike Miselis in this video, is running*

---

[1]  Dylann Roof is a white supremacist who, in 2015, murdered nine African-Americans as they participated in a Bible study at a historically Black church in Charleston, South Carolina in a self-proclaimed effort to start a race war.

[2]  Robert Bowers, with whom McMahon communicated over Gab, has been charged with murdering eleven people in a synagogue shooting targeting Jews in Pittsburgh in 2018.

> *for City Council in Charlottesville.   I will do everything in my power to stop him from getting elected for his attack on my people, & I do mean everything . . . this nigger is known to be a violent terrorist."*

In the post, the defendant included a link to the aforementioned YouTube video that depicted members of the Rise Above Movement, including Michael Miselis, committing acts of violence against counter-protestors on August 12, 2017, for which they were subsequently charged with and convicted of Riots Act violations before this Court.   Towards the end of the video, during a melee instigated by the Rise Above Movement defendants' attacking counter-protestors, Gathers can be seen swinging a stick at one of the defendants from the edge of a crowd of people, as that defendant continued to assault counter-protestors.

Several Gab.ai users commented on the defendant's first post.   In one exchange, another user said "GOOD, Do whatever you need to do, fuck that fucking nigger.   This is our fucking country" to which the defendant publicly replied:   *I ask that you join me.   This is not a one man job.   Activism against Don Gathers with a diversity of tactics must be used to stop his candidacy."* When the user suggested attending Gathers's event scheduled for January 8, 2019 "dress[ed] as opposition" in order to "get in close till something happens then get them from behind," the defendant replied "*Indeed.*"

That same day, NBC29 – another local Charlottesville news outlet – reported that Gathers would be running for Charlottesville City Council, and the defendant posted a link to the article and stated:

> *I'm going to issue a formal warning to Don Gathers.   Do not run for office after what you did to our people on August 12.   If you think I'm going to allow a violent communist like you to run for office after attacking one of my people with a rake handle, you got another thing coming.   Drop out now.*

The defendant continued, publicly posting in two additional posts:

> *I'm going to add something to Charlottesville activism in 2019 in addition to supporting our political prisoners, and that is stopping violent terrorist Don Gathers from being elected to the Charlottesville City Council after he committed a violent hate crime on Mike Miselis.   I endorse a diversity of tactics for the activism against*

*Don Gathers.*

*I am declaring Don Gathers to be the most dangerous violent Antifa in the USA . . . because he is running for office after attacking our people with a rake handle. Don Gathers has a murderous Anti-white mentality similar to Nicolas Maduro of Venezuela.   His candidacy [for the position of City Council in Charlottesville] is a threat to national security and every White man on Earth, I am not fucking around.   He must not be allowed to get elected.*

In response to this post, one of the organizers of the Unite-the-Right rally took a screenshot of this post on Gab.ai and reposted it, stating

"[A]ny attacks on [Gathers] will only increase his support among Charlottesville residents.   Take the high road and avoid harassment, ethnic slurs, or anything that would let this creep claim a phony moral high ground.   Do the research, the media won't no doubt, but be smart how you use it."

The defendant responded:

*Bro.   A diversity of tactics must be used.   You know how dangerous this man is. What if Don Gathers rapes a white woman while in office?*

*I am seriously afraid that if Don Gathers is elected, he will pull a Bill Cosby on multiple White women.   We already know he's violent and hates White people....*

### 3.   The FBI Reports Postings to Local Law Enforcement, and Gathers Announces He Will Not Run for Office -- January 8, 2019

On the morning of January 8, 2019, the FBI in Charlottesville discovered the defendant's postings from the previous evening.   Pursuant to FBI policy, which requires that agents notify local law enforcement of any credible, imminent threat to public safety, an FBI agent in Charlottesville immediately contacted the Charlottesville Police Department (CPD).   Because Gathers' public campaign kick-off event was scheduled for that same evening, that day the FBI agent and a Task Force Officer with CPD/FBI met with Gathers to inform him of the threats against him.   In response to the postings, the CPD also provided additional security personnel for the event that evening.

At the campaign kick-off event on the evening of January 8, 2019, Gathers, instead of announcing his candidacy for Charlottesville City Council, told those assembled he would not run

for that office due to health concerns.   Gathers later told the FBI that the health concerns that he had cited were a "smokescreen" for his decision to drop out of the race.   Gathers also informed the FBI that the online threats affected that decision because he was scared for the safety of himself and his family, and that in the aftermath of the threats he had taken numerous steps to guard his safety.

### 4.   The Defendant Declares "Victory" in Response to Gathers' Decision to End His Candidacy.

On January 9, 2019, the day after Gathers announced he would not run for office, the defendant posted about this news on Gab.   Specifically, he reposted a Daily Progress article that reported Gathers's change of heart, and stated:

> *A day after an article comes out about him attacking Mike Miselis with a rake handle, Gathers puts his Charlottesville City Council campaign on hold, citing 'health issues from a heart attack.'   But we all know the real reason Gathers put his campaign on hold.   His violent terrorist actions on August 12 are haunting him along with a Pale Horse. :D.*

"Pale Horse" is a reference to the defendant's online avatar, which is a cartoon drawing of a white horse.

On January 10, 2019, the defendant posted a link to an article reporting Gathers's decision to put his campaign on hold, and wrote: "Hail Victory!"

That same day, a different candidate (who was not African-American) announced that she was running for the position of Charlottesville City Council.   In response to that candidate's announcement, the defendant posted that *"I will NOT endorse a \'diversity of tactics'\ to stop her campaign like I did with Don Gathers.   Instead, we will rely on traditional opposition research*."

When viewed in context on the morning of January 8, 2019, the FBI immediately understood the defendant's use of "diversity of tactics" to be a thinly-veiled euphemism for violence.   Moreover, this last post on January 10, 2019, in which the defendant juxtaposed a call for "diversity of tactics" with "traditional opposition research" served as additional evidence that

"diversity of tactics" meant violence.   Finally, when the FBI obtained a search warrant of the defendant's Gab account, the defendant himself acknowledged the phrase "diversity of tactics" to be a euphemism for violence.   In one post from November 20, 2018, the defendant explained that "\diversity of tactics\" is "code for Antifa wanting to bike lock you over the head."   In another post, he endorsed a "diversity of tactics" to stop Antifa, saying "We are not pacifists."

> **5.   Additional Investigation Revealed McMahon's Deep-Seated White Supremacist Beliefs, Confirmed the Racial Motivation for His Threats Against Gathers, and Revealed His Obsession with Mass Murder**

Investigation both before and after McMahon's arrest revealed that he threatened Gathers because of longstanding, deeply held white-supremacist beliefs, and that McMahon targeted Gathers specifically because he is African-American.   Before McMahon's arrest, federal search warrants executed on McMahon's Gab and Twitter accounts revealed that McMahon had been making racially derogatory posts about Gathers on Gab a full nine months before he first posted the threats concerning Gathers's candidacy.   Examples include:

- "Don Gathers isn't a man of God.   He's not even a man at all.   Don Gathers is a worthless, violent, ugly, shitskinned nigger who cowardly attacks people from behind with rake handles, and I have it on video."   (Gab, 4/8/18).

- "Violent nigger terrorist Don Gathers and his fat hideous wife [ ] are going to Ghana . . . . I think that nigger should stay in Ghana along with the rest of em."   (Gab, 5/1/18).

- "Violent nigger terrorist Don Gathers, Cville's nigger mayor [ ], and Cow Bell Lady [ ] return from Ghana.   But I don't get it, why didn't they want to stay in Africa?   I thought the USA was \rayciss\"?"   (Gab, 5/12/18).

- "I hope that [names omitted] Don Gathers . . . &amp Charlottesville Mayor [ ] take a trip to the Congo, get infected with Ebola &amp; die!   All Virginia nigger thugs deserve Ebola!   And I hope that their Antifa friends get infected too and they all burn in Hell next to Heather Heyer[3] and Kevin Lee \Laced Up\" Grace!"   (Gab, 5/21/18).

---

3 Heather Heyer was murdered during the Unite-the-Right riots in Charlottesville on August 12, 2017, when avowed white supremacist James Fields plowed his car into a crowd of peaceful counter-protestors near the intersection of Fourth and Water Streets, hitting and killing Heyer and seriously injuring over 30 others.

Additionally, in both McMahon's Gab and Twitter accounts, he made numerous posts that further evidenced his white supremacist beliefs and his broader animus against minorities.   Examples of these posts, many of which pre-date the threats to Gathers, include:

- "If you're with the Antifa or the niggers, then you're my enemy and I will defeat you!" (Gab, 12/26/17).

- "Dylann Roof is a God damn hero" (Gab, 4/30/18).

- "Ebola is the only thing better than Dylann Roof.   There is nothing more satisfying than a nigger getting a disease that makes it bleed from the eyes and infects it's own nigger family and nigger friends before dying.   And no Whites will ever be jailed over it either.   Can't arrest Ebola Chan!   She's just to Kawaii! :D" (Gab, 5/21/18)

- "Bowers is a good man."   (Gab, 12/13/18).

- "No I just want to live in a White Community, &amp; make White Babies." (Twitter direct message, 1/1/19).

- In response to a question concerning his views on Black people: "I don't think they are very smart, cept a few. . . [I want] for them to have their own ethnostate in Africa. . . . Because it's what Nature and God wants."   (Twitter conversation, 1/14/19).

- "If you're ok with Antifa.   Then you deserve to join Heather.   Heather Heyer . . . was scared and weak.   :D"   (Twitter conversation, 1/16/19).

McMahon's Gab account also contained direct messages with another Gab user from the spring of 2018, in which McMahon admitted to being a member of the white supremacist organization Identity Evropa, until the group expelled him.[4]

After his arrest, the FBI identified a large volume of racial animus evidence on McMahon's personal computer.   Searches of that computer showed that McMahon meticulously documented his online activity.   Among the myriad folders, McMahon kept a folder titled "nigger" that contained numerous racist images, including photographs of dead African-American men.   The file names McMahon used for these photographs included "hungnigger," for a photograph of a

---

[4] Identity Evropa is an American neo-Nazi and white supremacist organization that participated in the Unite-the-Right rally in Charlottesville.   In 2019, following negative publicity, its leaders dissolved the group and reformed it as the American Identity Movement.

lynched African-American man hanging by a noose from a tree; "deadniggers," for a photograph of an African-American man lying face-up, apparently dead, in a pool of blood; and "niggervsar15," for a photograph of an African-American man seated on a sidewalk with what appears to be an AR-15 rifle pointed at him.   McMahon also saved images of Trayvon Martin[5] lying dead on the ground, including a close up of the bullet wound in his torso.   He also maintained a folder that contained a large volume of racist memes, including a number of memes that supported the view that Black people are violent and intellectually inferior, as well as folders containing additional social media posts, which McMahon appears to have downloaded and saved, in which he aggressively promoted white supremacy and neo-Nazi ideology.

McMahon's computer also contained images he saved that demonstrate his support for white supremacy and Nazi ideology.   As one example, McMahon saved this image in a folder titled, "guns I used to own:"



The metadata from the photograph shows that McMahon took this photograph himself.

Finally, an examination of McMahon's computer showed him to be obsessed with gun violence, mass murder, and racially-motivated violence.   McMahon saved numerous images

---

[5] Trayvon Martin was an African-American teenager who was shot and killed by a member of a neighborhood watch group in Florida in 2012.

related to mass shootings and mass casualty attacks, including photographs of Dylann Roof, both Tsarnaev brothers (including photos of Tamerlan Tsarnaev after he died, with grievous injuries visible),[6] Seung-Hui Cho (the Virginia Tech school shooter), images of the guns in Stephen Paddock's hotel room,[7] and a photograph of the journalist Vester Flanagan as he shot two co-workers dead while on live television.

McMahon also saved a number of images related to the hate crime car attack by white supremacist James Fields in Charlottesville, Virginia in August, 2017.   This included a series of photos of the car as it struck a crowd of counter-protesters, as well as close-up photos of Heather Heyer, the Charlottesville woman who was killed the attack, just moments after she was mortally wounded.

McMahon also saved photographs of himself posing with various guns, including in poses that glorified violence, such as this one:



In sum, evidence gathered prior to McMahon's arrest showed that he targeted Don Gathers because of his race and that he readily and frequently espoused white supremacist beliefs online. The large trove of evidence on his personal computer confirmed McMahon's substantial racial bias against African-Americans, provided a unique picture of the deep-seated nature of his white

---

6 Tamerlan and Dzhokhar Tsarnaev bombed the Boston Marathon in 2013, killing three people and wounding hundreds.   Tamerlan Tsarnaev was killed during a law enforcement manhunt after the attack.   Dzhokhar Tsarnaev was captured, convicted, and sentenced to death for his role in the bombing; in July 2020, the First Circuit set aside that death sentence and remanded the case for a new penalty-phase trial.
7 Paddock killed fifty-eight attendees at an outdoor country music concert in Las Vegas, Nevada in 2017.

supremacist ideology, and revealed him to be obsessed with mass murder and racially-motivated violence.

### B.  Count Two – Cyberstalking of Victim 2

On September 18, 2019, the FBI arrested the defendant for the conduct related to Don Gathers and searched his home in Brandon, Florida. As news of his arrest began circulating in the media and online, one person, Victim 2, contacted the U.S. Attorney's Office for the Western District of Virginia and reported that the defendant had recently used Facebook to threaten her and her minor daughter.

The FBI learned that Victim 2 is active in her community and had become involved in countering pro-Confederate/White-Nationalist protests. After McMahon, who actively supported Confederate/White-Nationalist protests, learned about Victim 2, he began an online campaign to intimidate her by making extortionate threats.   Specifically, as part of McMahon's self-proclaimed mission to locate, identify, and intimidate individuals who had expressed disagreement with his own white supremacist ideology (whom he generally refers to as "Antifa"), McMahon attempted to extort Victim 2 for information about another politically-active woman he dubbed "Skinny girl," whom he wanted to target.   McMahon demanded that Victim 2 provide him with information about "Skinny girl," or else he would sexually assault Victim 2's minor daughter, who has severe autism.

Facebook records verified Victim 2's account of McMahon's extortionate conduct.   On September 4, 2019, the defendant attempted to privately contact Victim 2 using one of his Facebook accounts.   Victim 2 did not respond.   Then, on September 14, 2019, the defendant tried to privately contact Victim 2 again using Facebook. This time the defendant persisted because he wanted to identify and obtain personal information about "Skinny Girl."   In his conversations with Victim 2, the defendant first identified several counter-protestors by name and commented, among other things, that several of them are "afraid of me." The defendant also sent Victim 2 a picture of

several people and said, "Look it's your boss, black tank top! Skinny Girl!" Other than sending a

few messages suggesting that the defendant had confused her with someone else, Victim 2 did not

discuss what the defendant wanted to discuss.  Finally, after about 15 messages sent over the

course of two separate days, the defendant said he knew how to make Victim 2 talk and had the

following exchange in which he sought to extort information from Victim 2 regarding "Skinny

Girl's" identity by threatening Victim 2's autistic minor child:

| | |
|---|---|
| DEFENDANT: | Oh I can make you talk. |
| DEFENDANT: | I know the spot which will make you talk. |
| VICTIM 2: | How's that? |
| | |
| DEFENDANT: | How's your autistic daughter? |
| DEFENDANT: | Maybe I should ask her a few questions? Is she old enough to get a little… |
| DEFENDANT: | …frisky? |
| DEFENDANT: | [Smiley Face Icon] |
| DEFENDANT: | I wonder what's more important to you? Antifa or her? |
| DEFENDANT: | Shall we find out? |
| DEFENDANT: | Oh you're quiet now huh? |
| DEFENDANT: | Tell Skinny Girl to contact me. |
| DEFENDANT: | You want me to not mess around in [Location 1] anymore? That's up to her. |
| DEFENDANT: | You would choose your Antifa crap over your own autistic daughter? |
| DEFENDANT: | I guess you don't love her. |
| DEFENDANT: | You put Skinny Girl before your own disabled daughter. |
| DEFENDANT: | [Image] Middle, between [Person 1] and [Person 2]. |
| DEFENDANT: | Tell her to contact me. |
| DEFENDANT: | Tell her to stop being so scared. |
| DEFENDANT: | Do it for your autistic daughter. |
| DEFENDANT: | She started all this. |
| DEFENDANT: | She better be willing to finish it. |
| | . . . |
| DEFENDANT: | Is she into men? |
| DEFENDANT: | If not…I can be her first. |
| DEFENDANT: | I'd like to see her in a dress. |
| DEFENDANT: | The same one your autistic daughter was wearing. |
| DEFENDANT: | Is she a virgin? Your daughter? |
| DEFENDANT: | What's wrong [Victim 2]? |
| DEFENDANT: | I just wanna know if your daughter is of age of consent. |
| DEFENDANT: | I can make her real happy if she is. |
| DEFENDANT: | Sounds like you want that. |
| DEFENDANT: | Maybe we can get her a rebel flag tramp stamp after she gets that little cherry popped! |

| | |
|---|---|
| DEFENDANT: | I'm a gentleman. |
| DEFENDANT: | I'll be very gentle with her, I promise. |
| DEFENDANT: | Then I'll get her some ice cream after! |
| DEFENDANT: | That's what she and you want right [Victim 2]? |
| DEFENDANT: | I think you get off to it. |
| DEFENDANT: | Maybe we should talk to Skinny Girl about it huh? |
| DEFENDANT: | The one you care more about than your own daughter. |
| | . . . |
| DEFENDANT: | [Victim 2], are you a pretty girl? |
| DEFENDANT: | Like your daughter? |
| DEFENDANT: | Skinny Girl, have her contact me. |
| | . . . |
| DEFENDANT: | You failed your daughter. |
| DEFENDANT: | You chose Antifa, a terrorist group, over your own daughter. |
| DEFENDANT: | And you know it, [Victim 2] |

Then, a couple of days later, the defendant continued to threaten Victim 2's minor child and insist that Victim 2 provide information about "Skinny Girl."

| | |
|---|---|
| DEFENDANT: | Isn't your daughter an incel? |
| DEFENDANT: | Your autistic daughter? |
| DEFENDANT: | If she wants her cherry popped, I'll gladly do it if she is of age of consent, but she must promise not to flap her wrists when I go down on her.[8] [Winking Face Icon]. |
| | |
| VICTIM 2: | What kind of monster says those things? |
| | |
| DEFENDANT: | Oh did I strike a nerve? |
| DEFENDANT: | Maybe you should have put your daughter before your Antifa terrorism? |
| DEFENDANT: | You see…Your kind [h]as no honor. |
| DEFENDANT: | I have no reason to show you any sort of mercy. |
| DEFENDANT: | Your wrist flapping daughter is fair game. |
| DEFENDANT: | Hell, I got an Antifa who suffered a brain injury to tell me so much info. |
| DEFENDANT: | Your Antifa thugs attacked my brother,[9] with sucker punches and blunt objects, chased him with ASP batons and firearms, tried to murder him in Charlottesville. |
| DEFENDANT: | Your Antifa thugs disrespected the dead… |
| DEFENDANT: | And your Antifa thugs wanted to target my family. |
| DEFENDANT: | And so I have no reason to be kind to you. |
| DEFENDANT: | The only useful thing about you… |
| DEFENDANT: | Is your womb. |
| DEFENDANT: | That's it! |
| DEFENDANT: | Skinny Girl could end all this, but you wanna put her |

---

8 Some people with autism engage in self-soothing repetitive behaviors. Some of those behaviors are rocking, twirling, and hand motions that may appear to be flapping.

9 As noted in the Final PSR, the defendant does not have any siblings.   PSR ¶ 50 (Doc. # 53).

|  |  |
|--|--|
|  | before your own wrist flapper daughter. |
|  | . . . |
| DEFENDANT: | Pretty funny how easy it is to find out my enemy's weakness huh? |
| DEFENDANT: | I know your weakness. |
| DEFENDANT: | And that's your little wrist flapper. |
| DEFENDANT: | Your daughter. |
| DEFENDANT: | The more your thugs hide, the nastier I'll get. |
| DEFENDANT: | Your thugs set the terms, not me. |
| DEFENDANT: | Set up the meeting. |
| DEFENDANT: | Me and Skinny Girl. |
| DEFENDANT: | I've seen her face, it's over. |
| DEFENDANT: | No more hiding. |
| DEFENDANT: | If you wanna confront me, you better be about it! |
| DEFENDANT: | Or rather, Skinny Girl. |
| DEFENDANT: | Like I said, she's the only one who can end this, no one else, except maybe her friend Goblin Girl. |

Approximately two days after that, and after no substantive response from Victim 2, the defendant continued:

|  |  |
|--|--|
| DEFENDANT: | I should post a pic of your wrist flapper on Gab. |
| DEFENDANT: | Sound like a good idea? Where's Skinny at? |
| DEFENDANT: | Oh now you're listening! |
| DEFENDANT: | What's her name? |
| DEFENDANT: | Make it easy on all of us. |
| DEFENDANT: | Ok . . . Guess I Need to do a countdown. |
| DEFENDANT: | You have 1 minute! |
| DEFENDANT: | My stop watch is going. Name of Skinny Girl please? |
| DEFENDANT: | 30 seconds! |
| DEFENDANT: | Oh too slow [Victim 2]! |
| DEFENDANT: | Hahaha! |
| DEFENDANT: | Hey you made the choice not me. |
| VICTIM 2: | You have no picture. You know nothing. |
| VICTIM 2: | You're a sad, pathetic loser. |
| DEFENDANT: | lol |
| DEFENDANT: | [Photo of Victim 2's daughter] |
| DEFENDANT: | "Hi mommy!" |
| DEFENDANT: | "flap flap flap flap flap" |
| DEFENDANT: | Hahahaha! |
| DEFENDANT: | So about Skinny Girl . . . Let's talk about her, now that you know I'm for real. [Winking Face Icon] |
| DEFENDANT: | I'm not really interested in your daughter flappy. |
| DEFENDANT: | Why is Skinny Girl so afraid of me? |

| DEFENDANT: | Just wanna talk! |
| DEFENDANT: | Don't you care about Flappy more than Skinny Girl? |

In addition to this, the examination of McMahon's computer revealed that, around the same time the defendant sent messages, to Victim 2, he also used the internet to conduct searches related to his threats. For example, on September 17, 2019, McMahon used Google to conduct the following four searches: "sex with autistic girls," "sex with autistic girls," "sex with autistic girls," and "sex with aspergers girls."

The defendant bragged to other like-minded individuals that he spent his time identifying counter-protestors and offered his advice about how to kill such counter-protestors. Prior to the defendant threatening Victim 2 and her minor child, Victim 2 saw the following messages, which the defendant posted to Facebook using the pseudonym "Dakota Stone:".

| DEFENDANT: | I'm the Antifa hunter. I'm pretty famous for it actually . . . I ID'd over 850 Antifa who went to C[harlottes]ville . . . Most of the Chapel Hill, Carrboro, and Durham were doxed by me. . . . |
| DEFENDANT: | God put me on this Earth to hunt and stop Antifa. |
| DEFENDANT: | If they attack you, you must kill them in self defense with the Stand Your Ground law. |
| DEFENDANT: | If an Antifa attacks you, you can kill them in self defense with a gun, just shoot the Antifa 2-4 times if they attack you first, and claim Stand Your Ground. Easy. |

Given the defendant's promotion of the use of violence against counter-protestors and the threatening and obscene descriptions of what he planned to do to Victim 2's autistic minor child if Victim 2 did not comply with his demands for information about "Skinny Girl," the defendant's extortionate threats and intimidation caused Victim 2 serious emotional distress and made her scared for the safety of her minor child.

## C.   ADDITIONAL RELEVANT CONDUCT

As discussed above, the search of McMahon's computer revealed evidence of substantial

additional online criminal activity. An FBI review also found evidence of aggravated identity theft, hacking, and cyberstalking of numerous other victims, mostly in connection with McMahon's self-assigned "Antifa hunting" mission, which, as described above, McMahon believes is his life's purpose.

For example, the evidence on McMahon's computer confirmed that he obsessively scoured the internet for public and private sources of deeply personal information that he could use to target and exploit people. In doing so, McMahon obtained, among other things, photographs of targets, targets' family members (including children), and a target's residence and personal vehicle. He then saved and organized the information he collected in computer folders that were labeled with the target's name, and often used the information he gathered to harass the person online, usually through social media.   In one instance, McMahon learned that a woman had recently been through several personal tragedies, including the death of a child.   In harassing messages to her, through which he tried to extort information about perceived members of "Antifa," McMahon repeatedly referenced this tragedy.   Often, when McMahon managed to successfully harass a person to a degree he deemed satisfactory, he took screenshots of his work and then saved the screenshots in files with the person's name (or another identifier if the defendant did not know the person's name) and the word "owned."   Indeed, the FBI's review of McMahon's computer, documented in the videos submitted as Exhibits 1 and 2 to this memorandum, show 278 files saved with the term "owned" in the title.[10]

While some of the information McMahon gathered appears to have been obtained through publicly available social media or other public sources, evidence on McMahon's computer indicates that he illegally obtained other information.   For instance, McMahon, using the hacker

_____

10 Exhibits 1 and 2 document an FBI search for the term "owned" in a folder on the defendant's computer called "Kayla," where the defendant saved most of his online white supremacist activity.   Exhibit 1 shows the search for "owned" and the results of that search with the file names displayed on the 278 search results.   Exhibit 2 shows the same search for "owned" with thumbnail views of the content of each of the 278 responsive files displayed.

identity "Snake," appears to have hacked into and downloaded the entire Google Gmail account of one politically active woman whom he targeted for harassment and intimidation.   In doing so, he obtained approximately eight years of her private communications and personal photographs, which he then used to harass her online.

In addition to this, the FBI found evidence showing that McMahon, as "Snake" or otherwise, had obtained photographs of numerous different individuals' personal identification documents, assumed one of these individual's identities on Facebook, hacked the Facebook accounts of several individuals he wanted to harass for various reasons, and engaged in serious hacking activity dating back to the mid-2000s.   In total, McMahon, as "Snake," compiled 35 gigabytes of data that he could weaponize against his targets as he saw fit.

## II. PROCEDURAL HISTORY, THE PLEA AGREEMENT AND STATUTORY PENALTIES

On September 11, 2019, following an extensive federal investigation into the defendant's racially-motivated threats against Don Gathers, McMahon was charged in a four-count indictment by a grand jury in the Western District of Virginia, and arrested one week later on September 18, 2019, at his home in Florida.   During a search of his home, FBI agents recovered McMahon's computer and several loaded firearms from his bedroom.[11]   The government then moved to detain him pending trial.   At his detention hearing, before a U.S. Magistrate Judge in the Middle District of Florida, the government presented evidence that the defendant's mother told the FBI that she felt that her son had characteristics similar to recent mass shooters.   *See* Detention Hearing Trans., at 8, attached as Ex. 3.   The judge detained the defendant on dangerousness grounds, finding that "the defendant's irrational hatred of blacks, Jews, and gays, along with his ability to obtain firearms, presents a clear and convincing danger that his mental instability will cause him to engage

---

11  The agents executed the arrest and search warrant at approximately 6:00 a.m.   Data on the computer showed that the computer had been in use, accessing the internet, at approximately 5:50 a.m.

in acts of violence."   Detention Order, attached as Ex 4.

As noted above, when the news of McMahon's arrest became public, Victim 2 came forward with additional allegations of online threats by McMahon.   In light of this, as well as the evidence of still other online crimes committed by the defendant that was discovered in a search warrant of his devices, the United States Attorney's Office for the Middle District of Florida launched an investigation.

On April 20, 2020, a two-count Superseding Information was filed in this Court to resolve both active investigations.   Count One relates to the conduct targeting Don Gathers, and charges Bias-Motivated Interference with a Candidate for Elective Office in violation of 18 U.S.C. § 245(b)(4).   Count Two relates to the conduct targeting Victim 2, and charges Cyberstalking in violation of 18 U.S.C. § 2261A.   The defendant pleaded guilty on the same date to both offenses. The maximum penalty for Count One is one year of imprisonment, a $100,000 fine, up to one year of supervised release, and a $25 special assessment.   For Count Two, the maximum penalty is five years' imprisonment, a $250,000 fine, up to three years of Supervised Release, and a $100 Special Assessment.

In the plea agreement, the defendant agreed to waive venue as to Count 2, and he also stipulated to specific guideline provisions – to include a 3-point enhancement for a hate crime motivation.   The plea agreement also contains a "completion of prosecution" provision that he will not be further prosecuted for federal crimes committed prior to the execution of the agreement within the Western District of Virginia or the Middle District of Florida.

### III.   DETERMINING THE SENTENCES TO BE IMPOSED.

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the United States Sentencing Guidelines are no longer mandatory.   However, "[a]s a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and

the initial benchmark" for determining the defendant's sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007).   While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," *Kimbrough v. United States*, 552 U.S. 85, 90 (2007), it remains the case that "the Commission fills an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Id.* at 108-09 (*quoting United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). The Supreme Court "accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Id.* at 109 (*quoting Rita v. United States*, 551 U.S. 338, 350 (2007)).   As the Fourth Circuit has recognized, in the wake of *Booker*, a sentencing judge is required to engage in two-step analysis to determine a reasonable sentencing:

> [A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence.

*United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

When weighing the section 3553(a) factors as part of its determination of an appropriate sentence, the Court should consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives — that is, that the sentence: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide the defendant with needed educational or vocational training and medical care. *See* 18 U.S.C. § 3553(a)(1) and (2).   In addition, the sentence should reflect "the need to avoid

unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

## IV.    GUIDELINES ANALYSIS

The defendant's total offense level was correctly calculated to be 20, which includes the 3-point enhancement for a hate crime motivation, a 2-point adjustment for an additional victim, and a 3-point reduction for his acceptance of responsibility.   At criminal history category I, the guideline imprisonment range is 33 to 41 months.

## V.    THE § 3553(a) FACTORS DEMAND A SENTENCE AT THE TOP OF THE GUIDELINE RANGE.

### A.    The Nature and Circumstances of the Offense Warrant a 41-Month Sentence

The facts of this case call for serious punishment.   The right to freely participate in elections, either through voting or by running for office, is one of the most fundamental values in this Nation.   Yet this defendant, sitting in his bedroom in Florida, was determined to interfere with the free exercise of that right here in Charlottesville, nearly 1,000 miles away, for a vile reason:   unabashed racism.   He waged a racially-motivated campaign of intimidation against Don Gathers and issued a call for violence against Gathers that was marketed specifically at the defendant's fellow white supremacists—all because Gathers sought to run for City Council, and because he is African-American.   And, unfortunately, the defendant succeeded.   The threats led to Gathers ending his campaign before it ever officially started.   With the painful memories of the violence at the Unite-the-Right rally still hanging in the air, the defendant's rabidly racist threats prevailed, and Gathers chose not to subject his family, his supporters, and himself to the possibility of more racially-inspired violence.

The defendant's crime against Victim 2 is also egregious.   In his self-proclaimed quest to intimidate and harass those who disagree with his white-supremacist ideology, the defendant attempted to extort Victim 2 by making threats that exploited her maternal instinct to protect her

child from harm.   Over a period of days, the defendant threatened to sexually assault Victim 2's

minor daughter, who has severe autism, unless Victim 2 complied with his demands for

information.   The defendant took steps to appear to be able to make good on his threats—at one

point, he obtained and publicly posted a photograph of Victim 2's daughter on the internet, as a

show of his power.   And, of course, his contemporaneous Google searches of "sex with autistic

girls" revealed his true state of mind.   The defendant's campaign of harassment clearly sought to,

and did, put Victim 2 at great fear for her safety and for the safety of her vulnerable daughter.

These crimes warrant serious punishment.   Although Counts 1 and 2 are factually

dissimilar, they share one ugly characteristic:   they sought to victimize others to promote the

defendant's white-supremacist ideology.   The defendant intimidated Gathers to drop out of the

City Council race because, in the defendant's mind, African-Americans are too inferior to hold

public office, and should be put in their place.   This intimidation had an impact on Gathers, his

family, and the larger Charlottesville community; indeed, by intimidating Gathers to drop out, the

defendant, sitting at his computer in Florida, had an impact on the political system of a community

nearly 1,000 miles away in Virginia.   And the defendant cyberstalked Victim 2 and threatened

her daughter all in the service of his self-assigned "mission" to hunt down and silence anyone who

spoke out against white supremacy.   The defendant's conduct is reprehensible, and it served a

despicable purpose.   And in the process, his victims suffered real harm.   Only a sentence at the

top of the Guidelines range appropriately accounts for the egregious nature and circumstances of

these offenses.

### B.   The History and Characteristics of the Defendant Support a 41-Month Sentence

The defendant's personal history also warrants this punishment.   While he has no prior

criminal convictions, the evidence on his computer shows that McMahon is obsessed with hate-

motivated violence, apparently idolizes mass murderers, and has long engaged in serious criminal

conduct online, including computer hacking that dates back to the early 2000s.   More recently, as part of his "Antifa-hunting," the defendant amplified his efforts to go to any length to target, intimidate, and harass anyone he perceives as disagreeing with him, including, in one instance, by illegally hacking the entire Google Gmail account of one of his targets.   And, of course, as shown through the instant charges, the defendant used threats of violence both to target his political enemies, and to intimidate people because of their race.   Despite the defendant's lack of criminal history, his history and characteristics, as well as this relevant conduct, all support a sentence at the top of the Guidelines.

> **C.      The Remaining Sentencing Factors—Protecting the Public, Deterring the Defendant, and Promoting Respect for the Law—Support a 41-Month Sentence**

The remaining sentencing factors similarly support a sentence at the top of the Guidelines. A substantial sentence of incarceration will protect the public from the defendant, who from his home in Florida used the internet as a powerful weapon against victims across the country. Significantly, such a sentence will also go a long way toward promoting respect for the law.   The defendant is known to communicate with leaders in the white-supremacist community; indeed, one of the organizers of the Unite-the-Right Rally personally responded to the defendant's Gab postings about Don Gathers.   To the extent that the defendant commands respect from like-minded white supremacist leaders, a sentence at the top of the Guidelines will demonstrate that racially-motivated violence is not tolerated under the law and will be punished accordingly.   For all these reasons, the Court should impose a sentence at the top of the Guidelines range.

> **VI.      THE COURT SHOULD REQUIRE DEFENDANT TO OBTAIN PRIOR APPROVAL TO USE THE INTERNET FROM THE PROBATION OFFICE**

Once the defendant is released from incarceration, the government asks that the Court prohibit the defendant from accessing the internet for any reason without prior written approval from the Probation Office, for the duration of his period of supervised release.   Under 18 U.S.C.

§ 3583(d)(1), "district courts are afforded broad latitude to impose conditions on supervised release.'" *United States v. Douglas*, 850 F.3d 660, 663 (4th Cir. 2017).   (quotation marks omitted). A court may impose "any special condition that is 'reasonably related' to the statutory sentencing factors referenced in 18 U.S.C. § 3583(d)(1)."   *Id*.   These factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to afford adequate deterrence of criminal conduct, and the need to protect the public from additional crimes by the defendant."   *Id*.   So long as a condition of release is reasonably related to these goals and "involves no greater deprivation of liberty than is reasonably necessary" to achieve them, the condition is properly imposed.   *Id*.

This condition of supervised release is critical here.   The defendant used the internet to commit both of the crimes for which he now faces sentencing, and evidence found on his computer shows he also used the internet to engage in a wide-ranging campaign of intimidation, harassment, and illegal hacking activity that spans many years.   The breadth of this conduct, and in particular the number of people he targeted for harassment and intimidation online, is shocking.   And, the Court need look no further than the defendant's own words to see why such a condition is necessary.   In a Gab post, the defendant declared, "God put me on this Earth to hunt and stop Antifa," and the defendant's primary method of doing so is on the internet.   In pursuing this objective, the defendant cast a larger and larger net online, until he was threatening everyone from a mom in another state whom he had never met, to a city council candidate in Charlottesville, Virginia.

Even in the face of a federal prosecution and a guilty plea, the defendant has indicated that he will resume his prior computer usage habits immediately upon his release from incarceration: as he told the Probation Officer in his PSR interview, he believes computer usage is the only effective "medicine" for his mental health conditions.   PSR ¶ 52.   In light of this, the nature and circumstances of the defendant's offense and his personal history and characteristics strongly

23

suggest that restrictions on his use of the internet are necessary to protect the public, to prevent the defendant from committing further crimes, and to vindicate his victims' legitimate interests in reducing the likelihood of future victimization.

The defendant's mental health evaluation, conducted by Dr. Sharon Kelly and submitted as an exhibit to its sentencing memorandum, does not undermine the absolutely necessity of this condition of release.  The government recognizes that Dr. Kelly's report does not include this recommendation in its post-incarceration treatment recommendations.   However, the government respectfully submits that Dr. Kelly's evaluation should carry little weight here, because she was not given access to any substantive information about the facts of this case before reaching her opinion:   rather, as detailed in her report, she relied solely on interviews with the defendant, his parents, and a review of the Superseding Indictment (Sept. 11, 2019) (Doc. # 11).   Significantly, the Superseding Indictment did not include a description of the threats against Don Gathers, and it contained no mention at all of the defendant's vile cyberstalking conduct toward Victim 2, as that criminal conduct did not come to light until after the defendant's arrest on September 18, 2019. Indeed, Dr. Kelly did not even review the defendant's sworn statement of offense for his guilty plea (Doc. # 45), which was filed publicly almost two months before her evaluative interview with the defendant, and almost three months prior to the date of her final report.   Due to the highly cabined set of information given to and considered by Dr. Kelly, as well as her heavy reliance on the defendant's own self-serving opinions, the court should give little weight, if any, to her assessment and recommendations, nor should her report factor into the Court's assessment of the necessary conditions of the defendant's supervised release.

Given the facts of this case, this condition of release is not more restrictive than reasonably necessary to achieve the purpose of supervised release.   Courts routinely impose conditions of

this nature when a defendant has victimized others by using the internet.[12]   *See, e.g., United States v. Mixell*, 806 Fed.Appx. 180, 185 (4th Cir. 2020) (affirming imposition of nearly identical condition in SORNA case); *United States v. LaCoste*, 821 F.3d 1187, 1191-92 (9th Cir. 2016) (noting that courts have upheld conditions that entirely ban a defendant from using the internet "when use of the Internet was 'essential' or 'integral' to the offense of conviction, or when the Internet played no role in the offense of conviction but the defendant had a history of using the Internet to commit other offenses") (collecting cases); *United States v. Cook*, 637 Fed.Appx. 743, 744 (4th Cir. Feb. 4, 2016) ("Such restrictions are routinely imposed on defendants convicted of sex offenses involving use of a computer."); *United States v. Syring*, Case No. 1:18-cr-36 (D.D.C. 2019) (imposing this same condition of release where defendant was convicted under 18 U.S.C. § 245(b) for sending racially motivated threats by email); *United States v. Kurzynski*, Case No. 2:18-cr-203 (W.D. Wa. 2018) (imposing computer monitoring condition in cyberstalking case). Where, as here, the defendant has used the internet as a tool to commit a litany of crimes with multiple victims and where the defendant, even after pleading guilty, has expressed an intent to return to his past computer usage after his release, this condition is necessary to satisfy the factors enumerated in § 3583(d)(1), and is not more onerous than required to meet those goals.

---

[12] To the extent that the Fourth Circuit has also recently vacated the imposition of some conditions of release that address internet usage, the Court has done so on the ground that the condition was imposed without any explanation by the district court as to why the condition was necessary.  *See*, e.g., *United States v. McMiller*, (4th Cir. 2020) (vacating imposition of special condition where "the Internet and social networking conditions . . . are exacting, were imposed for the rest of [the defendant's] life, and were left wholly unexplained"); *United States v. Ross*, 912 F.3d 740, 746 (4th Cir. 2019) ("The district court did not explain why Ross was given any of the special conditions for life. This lack of explanation contravenes the law of this circuit and constitutes plain error."); *United States v. Wroblewski*, 781 Fed.Appx. 158 (4th Cir. July 12, 2020) (unpublished) ("Despite the absence of record evidence that computers or the internet played any role in Wroblewski's offense, the district court provided no explanation at all for the imposition of this condition.").   Those cases are distinguishable, as here the Court has ample evidence upon which to find that this condition is no more restrictive than necessary to achieve the statutory goals of a period of supervised release.

## VII. CONCLUSION

For the reasons cited above, and for those to be cited at the defendant's sentencing hearing, the Court should sentence the defendant to a term of 41 months' imprisonment to be followed by three years' supervised release with a condition that prohibits the defendant from using the internet for any reason without prior written approval from the Probation Office.

WHEREFORE, the United States submits this memorandum in aid of sentencing and in support of its request for the imposition of the sentence.


Respectfully submitted,

|  |  |
|---|---|
| /s/Thomas Cullen | s/Risa Berkower |
| THOMAS T. CULLEN | Trial Attorney |
| UNITED STATES ATTORNEY | Civil Rights Division |
| WESTERN DISTRICT OF VIRGINIA | U.S. Department of Justice |
|  | 950 Pennsylvania Avenue NW, |
|  | (202) 305-0150 |
|  | risa.berkower@usdoj.gov |
|  |  |
|  |  |
| /s/Christopher R. Kavanaugh | /s/Daniel George |
| Christopher Kavanaugh, Va. Bar. 73093 | Daniel George |
| Assistant United States Attorney | Assistant United States Attorney |
| United States Attorney's Office | United States Attorney's Office |
| Western District of Virginia | Middle District of Florida |
| 255 W. Main Street | 400 N. Tampa Street, Suite 3200 |
| Charlottesville, VA 22902 | Tampa, Florida 33602 |
| 434-293-4283 | P:  813.274.6000 |
| christopher.kavanaugh@usdoj.gov | daniel.george@usdoj.gov |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 24, 2020, I electronically filed the foregoing motion with the Clerk of the Court using CM/ECF system, which will send notification of such filing to counsel of record.

__/s/Christopher R. Kavanaugh_____
Christopher Kavanaugh, Va. Bar. 73093
Assistant United States Attorney
United States Attorney's Office
255 W. Main Street
Charlottesville, VA 22902
434-293-4283
christopher.kavanaugh@usdoj.gov
